IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

OCCUPY EUGENE; FLORENCE E.
SEMPLE; and TERRILL E. PURVIS

    Plaintiffs,

  v.

UNITED STATES GENERAL SERVICES
ADMINISTRATION (GSA); WAYNE C.
BENJAMIN, Regional Director, GSA, in his
individual and official capacities;
KIMBERLY S. GRAY, Associate Director,
GSA, in her individual and official
capacities; and DAN M. TANGHERLINI,
Acting Administrator, GSA, in his
individual and official capacities,

    Defendants.

Case No. 6:12-cv-02286-MC

OPINION AND ORDER

1 -- OPINION AND ORDER

MCSHANE, Judge:

Plaintiffs allege that defendants violated their constitutional rights by denying plaintiffs permit to protest on federal government property. The individual defendants move to dismiss plaintiffs' claims against them in their individual capacities under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). For the reasons stated below, defendants' motion (ECF No. 36) is GRANTED.

## BACKGROUND

The Occupy movement began as a group of a few hundred protesters occupying New York City's financial district in September 2011 to protest social and economic inequality.[1] This original Occupy group is commonly referred to as "Occupy Wall Street." By October 15, 2011, the Occupy movement spread to Eugene, Oregon and many other cities throughout the country. Since that time, a group of protesters who call themselves "Occupy Eugene" (OE) has maintained protest sites at various locations throughout Eugene. The members of OE describe themselves as "a group of concerned citizens inspired by Occupy Wall Street." (First Am. Compl. at ¶ 5 [hereinafter FAC].) OE's protest movement focuses on "democracy, economic security, corporate responsibility, . . . financial fairness, and . . . accountability in the United States government." *Id.*

On May 1, 2012, plaintiffs and approximately ten to twenty-five other members of OE assembled at the plaza of the Eugene Federal Building[2] (Plaza). OE selected the Plaza because it "has always been a lawful place for demonstrat[ors] and picketers to congregate." *Id.* at ¶ 18.

---

[1] In accordance with the standard for a motion to dismiss, the court accepts the facts alleged by the non-movant-plaintiffs as true.

[2] The Eugene Federal Building is located at 211 East 7th Avenue, Eugene, Oregon.

2 – OPINION AND ORDER

Additionally, the Plaza is "located on a highly-visible, busy street corner [and] is adjacent to courthouses, federal, state, and municipal political offices . . . ." *Id.*

Shortly after OE arrived at the Plaza, the group set up a tent to use as a prop to draw attention to the issue that homeless people did not have a place to legally sleep during the night. Officer Thomas Keedy of the Federal Protective Services (FPS) instructed OE that they could not set up a tent or sleep at the Plaza, but they were welcome to stay as long as they would like. OE complied with Officer Keedy's instructions.

In addition, Officer Keedy asked if a member of OE would be a contact person for the group and sign a U.S. General Services Administration (GSA) permit application. Plaintiff Terrill Purvis (Purvis) agreed to be the point of contact and accepted the permit application. The group, however, was reluctant to apply for a permit because some members of OE knew that the GSA had not previously required protesters to apply for permits. Nevertheless, on May 2, OE submitted a standard sixty-day permit application to Officer Keedy. OE's application requested continuous, non-exclusive use of the Plaza from May 1 through July 1 for up to sixty people for a First Amendment demonstration. After Officer Keedy reviewed the application for potential security impacts, the GSA approved plaintiffs' permit application as requested.

OE used the Plaza without any major incidents[3] and according to the permit guidelines.[4] However, on June 6, when a member of OE contacted Officer Keedy about a sound permit for an

---

[3] One man smoked medical marijuana at the Plaza; however, after being informed that he was not permitted to do so while on federal property, he ceased. There was another reported incident involving a young man who vandalized some government property, but the young man was not affiliated with OE.

3 – OPINION AND ORDER

upcoming event at the Plaza, Officer Keedy informed the member that she would need to contact the local GSA manager. Officer Keedy said that "the rules for permits had been changed by the GSA due to the fact that the GSA had 'bad' experiences with other Occupy groups in other areas." (FAC ¶ 33.)

Near the end of the initial sixty-day permit period, defendant Wayne Benjamin (Benjamin) informed OE that, due to problems with other Occupy groups, the group's renewed permit would only last thirty days and have new restrictions. One of the new restrictions Benjamin informed OE about was that they could only use the Plaza from 8 a.m. until 5 p.m., Monday through Friday. On June 27, OE filed an application to renew its permit in order to extend their use of the Plaza through July. OE requested the same unrestricted terms of the initial permit. After OE protested the 8 a.m. to 5 p.m. restrictions, Benjamin amended the hours of assembly to 7 a.m. to 10 p.m., seven days a week. On June 30, OE informed the GSA that it disagreed with the restrictions and planned to remain at the Plaza without a permit.

On July 9, Benjamin denied plaintiffs' application to renew their permit. The GSA indicated that its primary reason for denying the permit was that OE sought "to maintain a presence in the plaza 24 hours a day for a period of 30 days." Defs.' Ex. 3 at 2. The GSA stated that it has "an interest in preserving the plaza for use by the general public, maintaining an aesthetically pleasing area and keeping the public safe." *Id.* (stating that 41 C.F.R. § 102-74.500(c) authorizes Federal agencies to disapprove a permit application in certain situations).

---

[4] OE shared the Plaza with several other groups and individuals who were not required to obtain permits.

4 – OPINION AND ORDER

The denial letter also indicated that plaintiffs could appeal the denial. *Id.* Plaintiffs did appeal but were unsuccessful. Defs.' Ex. 4, 5.

On July 10, Benjamin and another GSA manager went to the Plaza to verbally inform OE that their permit extension had been denied and that the members must vacate the Plaza within twenty-four hours. The managers indicated that if OE did not comply, the GSA would request law enforcement assistance from the FPS. OE responded to the mangers by stating that they believed that they did not need a permit and would continue without a permit.

The following day, as plaintiffs continued their protest, Officer Keedy and FPS Area Commander Michael Foster entered the Plaza and advised OE and other groups to leave the Plaza or face arrest. Subsequently, all of the OE member and members of the public evacuated the Plaza except plaintiff Florence Semple (Semple). Semple indicated to Officer Keedy that she believed that the eviction was unconstitutional and would only leave upon receipt of a citation or arrest in order to later challenge the eviction. Semple was arrested for violating 41 C.F.R. § 102-74.385, cited, and released.

The federal government charged Semple but later moved to dismiss the charge. Semple raised a constitutional challenge to the criminal charge and opposed the motion to dismiss. Semple argued that a court ruling was necessary to preserve the constitutional rights of citizens who wish to use the Plaza for First Amendment purposes. Nevertheless, the case was ultimately dismissed.

On December 13, 2012, plaintiffs returned to the Plaza to resume their protest. On December 14, Kimberly Gray (Gray) delivered a letter to plaintiffs indicating that they had

5 – OPINION AND ORDER

twenty-four hours to leave the Plaza or a complaint and subsequent arrests would occur. Gray's letter did not state any reasons for the ban, indicate the duration of the ban, nor provide any alternative venue for OE's protest. Despite the threat of arrest, plaintiffs continue to protest at the Plaza.

On December 18, 2012, plaintiffs brought two claims under the *Bivens* doctrine against defendants Benjamin, Gray, and the GSA alleging that defendants unconstitutionally denied their permit to protest. Plaintiffs' subsequent FAC comprises three claims. Plaintiffs' first and second claims request relief under the *Bivens* doctrine alleging constitutional violations of the First and Fifth Amendments. Plaintiffs' *Bivens* claims are against Benjamin, Gray, and Dan Tangherlini (Tangherlini) in their individual capacities. Plaintiffs' third claim for relief is under the Administrative Procedures Act (APA), Pub. L. No. 79-404, 60 Stat. 237 (1946). Plaintiffs' APA claim is against the GSA as well as Benjamin, Gray, and Tangherlini in their official capacities.

The individual defendants move to dismiss plaintiffs' *Bivens* claims for lack of subject-matter jurisdiction and failure to state a claim under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). These defendants assert two grounds for dismissal of the *Bivens* claims. First, they assert that plaintiffs' APA claim provides an adequate alternative remedy to a *Bivens* action. Alternatively, they assert that they are entitled to qualified immunity.

## STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations

6 – OPINION AND ORDER

allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 678.

While considering a motion to dismiss, the court must accept all allegations of material fact as true and construe in the light most favorable to the non-movant. *Burget v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000). However, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. If the complaint is dismissed, leave to amend should be granted unless the court "determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

## DISCUSSION

In *Bivens v. Six Unknown Named Agents of the Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1119 (9th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 675). Particularly, the Court provided Bivens with a damages action against federal officials for violating the Fourth Amendment. *See Bivens*, 403 U.S. at 397. In the subsequent decade, the Court extended *Bivens* in two additional cases where "the Court concluded an implied right of action for money damages was consistent with congressional intent." *W. Radio*, 578 F.3d at 1119 (referencing *Davis v. Passman*, 442 U.S. 228 (1979) and *Carlson v. Green*, 446 U.S. 14 (1980)). Since that time, however, the Court has refused to extend *Bivens* to a variety of factual and legal

7 – OPINION AND ORDER

contexts. *See, e.g., Wilkie v. Robbins*, 551 U.S. 537, 561-62 (2007) (declining to allow an implied right of action for a landowner who allegedly suffered harassment and intimidation by federal officials in violation of his rights under the Fourth and Fifth Amendments); *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988) (declining to allow an implied right of action for disabled persons who were allegedly denied Social Security disability benefits in violation of their due process rights); *Bush v. Lucas*, 462 U.S. 367, 368 (1983) (declining to allow an implied right of action for a federal civil-service employee who allegedly suffered unconstitutional employment actions); *Chappell v. Wallace*, 462 U.S. 296, 297 (1983) (declining to allow an implied right of action for military personnel who allegedly suffered racial discrimination at the hands of their superior officers).

Although the Court's acceptance of *Bivens* claims may have changed over time, the Court has consistently applied a two-step analysis to determine whether to recognize a *Bivens* claim. *Wilkie*, 551 U.S. at 550. First, the Court determines whether there is an alternative, existing process for protecting the plaintiff's interest. *Id.* When an alternative remedy exists, Congress expected the Judiciary to "refrain from providing a new and freestanding remedy in damages." *Id.* An alternative remedy does not, however, have to provide complete relief for a constitutional violation. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001). "So long as the plaintiff ha[s] an avenue for some redress, bedrock principles of separation of powers foreclose[s] judicial imposition of a new substantive liability." *Id.* Thus, the key inquiry is whether "the design of a Government program suggests that Congress has provided what it considers adequate remedial

8 – OPINION AND ORDER

mechanisms for constitutional violations that may occur in the course of its administration . . . ." *Chilicky*, 487 U.S. at 423.

Second, the Court asks whether there are "special factors counseling hesitation in the absence of affirmative action by Congress." *Bush*, 462 U.S. at 377. In this step, the Court must "weigh[] reasons for and against the creation of a new cause of action, the way common law judges have always done." *Wilkie*, 551 U.S. at 554. Thus, when considering a new judicially crafted remedy, the Court should consider whether the "*Bivens* cure would be worse than the disease." *Id.* at 561.

Turning to the facts of this case, the inquiry begins with whether an alternative remedy exists. Because plaintiff brought an APA claim in addition to their *Bivens* claims, plaintiffs do not, nor could they, dispute that an alternative remedy exists. Rather, plaintiffs argue that the APA claim does not provide an adequate remedy for the harm suffered. Plaintiffs' arguments are, however, neither novel nor persuasive.

First, plaintiffs argue that the APA is an inadequate remedy because it does not allow for monetary relief or a trial by jury. Pls.' Resp. at 8. However, both the Supreme Court and the Ninth Circuit have held that remedial schemes lacking monetary damages or a right to a trial by jury may be adequate if the absence of such procedural protections was not inadvertent on the part of Congress. *W. Radio*, 578 F.3d at 1125 (citing *Chilicky*, 487 U.S. at 424-25; *Libas Ltd. v. Carillo*, 329 F.3d 1128, 1129 (9th Cir. 2003); *Janicki Logging Co. v. Mateer*, 42 F.3d 561, 564-65 (9th Cir. 1994)). More specifically, although the APA is not categorically excluded under *Bivens* or its progeny, both the Supreme Court and the Ninth Circuit have denied *Bivens* claims

9 – OPINION AND ORDER

when a plaintiff had an alternative remedy under the APA. *See Wilkie*, 551 U.S. at 567-86; *see also W. Radio*, 578 F.3d at 1125.

In *Wilkie*, a landowner brought a *Bivens* action against Bureau of Land Management (BLM) officials for harassment and attempting to intimidate the land owner in order to obtain an easement across the landowner's private property. 551 U.S. at 541. The Court mentioned that the landowner had been "threatened with the loss of grazing rights, . . . prosecuted, . . . [had his] lodge broken into, . . . over a period of six years, by a series of public officials bent on making life difficult." *Id.* at 555. The landowner described the BLM harassment as "death by a thousand cuts." *Id.* Notwithstanding the lack of a damages remedy and jury trial, the *Wilkie* Court held that the APA was an adequate appropriate remedy. *Id.* at 561-62.

Likewise, in *Western Radio*, the Ninth Circuit held that the APA provided an adequate remedy to a plaintiff despite "the unavailability of money damages against individual officers or the right to a jury trial." 578 F.3d at 1123. The plaintiff in *Western Radio* brought *Bivens* and APA claims against Forest Service employees for violating his First and Fifth Amendment rights in connection to a lease that the plaintiff had with the Forest Service. *Id.* at 1118. The *Western Radio* court followed *Wilkie* and provided additional reasons why the court should "stay its *Bivens* hand" when a plaintiff has an alternative remedy under the APA. *Id.* at 1122-23. At the outset, the court noted that "*Wilkie* itself gave us a strong indication that the APA constitutes an 'alternative, existing process' for . . . damages claims." *Id.* at 1122. The court explained that the "APA's comprehensive provisions allow any person affected or aggrieved by agency action to obtain judicial review thereof, so long as the decision challenged represents a final agency action

10 – OPINION AND ORDER

for which there is not other adequate remedy." *Id.* (internal quotation marks omitted). Specifically, the APA authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to *constitutional right*, power, privilege, or immunity . . . ." 5 U.S.C. § 706(2)(B) (emphasis added). The court stated that "Congress considered the universe of harms that could be committed in the program's administration and has provided what [it] believes to be *adequate* remedies." *W. Radio*, 578 F.3d at 1123 (quoting *Adams v. Johnson*, 355 F.3d 1179, 1185 (9th Cir. 2004) (emphasis added) (internal quotation marks omitted). Ultimately, the *Western Radio* court concluded that "the APA leaves no room for *Bivens* claims based on agency action or inaction." *Id.* Therefore, as *Wilkie* and *Western Radio* clearly indicate, the lack of monetary damages or a jury trial does not make the APA an inadequate remedy for plaintiffs.

Second, plaintiffs argue that the court should follow the *Castaneda v. United States*, 546 F.3d 682 (9th Cir. 2008), decision in which the Ninth Circuit followed *Carlson* and held that the Federal Torts Claim Act (FTCA) did not preclude a *Bivens* action. OE states that the APA is analogous to the FTCA, and so the APA should not preclude a *Bivens* action. This argument, however, is also to no avail. *Western Radio* declared that the FTCA is not analogous to the APA, and "*Castaneda* is not controlling." *Id.* at 1124. The *Western Radio* court explained that "*Castaneda*'s decision to allow a *Bivens* claim . . . was thus driven primarily by a unique deficiency in the FTCA . . . ." *Id.* The court concluded that "[n]o such concern is present with the APA . . . ." *Id.* Thus, *Castaneda* and the FTCA are inapplicable to plaintiffs' alternative remedy under the APA.

11 – OPINION AND ORDER

Third, plaintiffs argue that the APA does not preclude a *Bivens* action because the APA, like the FTCA preceded *Bivens*, and so Congress did not intend for the APA to be a substitute for *Bivens*. Like plaintiffs' previous arguments, *Western Radio* court explicitly rejected this argument concerning the legislative history of the APA. *Id.* at 1124-25. Although the APA, like the FTCA, preceded Bivens, *Western Radio* distinguished the APA from the FTCA with respect to *Bivens*. *Id.* The court noted that "the congressional comments accompanying [post-*Bivens*] amendments made it *crystal clear* that Congress views FTCA and *Bivens* as parallel." *Id.* at 1124 (emphasis in original). There is, however, "no similar indications of congressional intent with respect to the APA." *Id.* Accordingly, the legislative history of the FTCA is inapplicable in plaintiffs' case involving an alternative remedy under the APA.

Finally, plaintiffs argue that *Western Radio* is distinguishable because it addressed *agency* action; whereas this case involves *employee* action. Pls.' Resp. at 9. The Ninth Circuit, however, has not recognized this distinction. In *Western Radio*, the plaintiff alleged "that the *individual* defendants were responsible for the Forest Service's denial of [plaintiff's] application . . . ." 578 F.3d at 1123 (emphasis added). In response to these allegations against the *individuals*, the court stated that "such *agency* actions and inactions could be challenged under the APA." *Id.* (emphasis added). As a result, the court concluded that "[plaintiff] cannot maintain its *Bivens* claims against the individual defendants for causing the [agency's] alleged actions or inactions." *Id.* Similar to *Western Radio* where the court considered the actions by the Forest Service employees to be "agency action," here, the actions of the GSA employees that led to the denial of plaintiffs' permit were also "agency action." The GSA cannot act by itself. The actions of the

12 – OPINION AND ORDER

defendants caused the GSA to take "agency action." As a result, like the plaintiff in *Western Radio*, plaintiffs can challenge such actions under the APA. Also, like *Western Radio*, plaintiffs cannot maintain their *Bivens* claims.

Plaintiffs state that such a holding "would write the *Bivens* doctrine itself out of law." Pls.' Resp. at 9. This is simply not the case. A plaintiff would still have a *Bivens* action in situations, unlike the situation here, where no other adequate remedy is available. *See, e.g., Moss v. United States Secret Serv.*, 711 F.3d 941 (9th Cir. 2012) (allowing a *Bivens* action against individual Secret Service agents for unlawful viewpoint discrimination).

In sum, Supreme Court and Ninth Circuit precedent establish that the APA, although not perfectly comprehensive, provides plaintiffs with an adequate alternative remedy. Because the APA is an adequate alternative remedy for plaintiffs' claims, there is no need to consider the reasons for and against the creation of a new cause of action under step two of the *Bivens* analysis. *See W. Radio*, 578 F.3d at 1125.

Thus, plaintiffs failed to state a claim under *Bivens*. Therefore, because *Bivens* does not give plaintiffs a cause of action against Benjamin, Gray, or Tangherlini in their individual capacity, there is no reason to enquire into the merits of defendants' asserted defense of qualified immunity.

////

////

////

////

13 – OPINION AND ORDER

## CONCLUSION

Defendants' motion to dismiss plaintiffs' *Bivens* claims for failure to state a claim (ECF No. 36) is GRANTED.

IT IS SO ORDERED.

DATED this 3rd day of December, 2013.

                                                    /s/ Michael J. McShane  
                                                    Michael McShane  
                                                  United States District Judge