IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

OCCUPY EUGENE; FLORENCE E.
SEMPLE; and TERRILL E. PURVIS

        Plaintiffs,

        v.

UNITED STATES GENERAL SERVICES
ADMINISTRATION (GSA); WAYNE C.
BENJAMIN, Regional Director, GSA, in his
individual and official capacities;
KIMBERLY S. GRAY, Associate Director,
GSA, in her individual and official
capacities; and DAN M. TANGHERLINI,
Acting Administrator, GSA, in his
individual and official capacities,

        Defendants.

Case No. 6:12-cv-2286-MC

OPINION AND ORDER

MCSHANE, Judge:

    Occupy Eugene (OE) brings this action under the Administrative Procedures Act (APA) challenging the General Services Administration's (GSA) denial of a permit renewal allowing

1 – OPINION AND ORDER

the group to protest at the Federal Plaza. Plaintiffs seek summary judgment on the ground that defendants' permitting scheme and the conditions imposed by the renewed permit violate their First Amendment rights. Plaintiffs also argue that defendants were required to provide a period of notice and comment for the changes to the regulations. Defendants countermove for summary judgment, arguing that the permitting regulations are constitutional as applied, and that no notice and comment period was required because any changes to the regulations were interpretative rather than substantive. Because the offered permit was not narrowly tailored to any significant government interest, and because the substantive changes to the regulations were put in place absent any notice and comment period, plaintiffs' motion for summary judgment is GRANTED.

## BACKGROUND

The Occupy movement began as a group of a few hundred protesters occupying New York City's financial district in September 2011 to protest social and economic inequality.[1] This original Occupy group is commonly referred to as "Occupy Wall Street." By October 15, 2011, the Occupy movement spread to Eugene, Oregon and many other cities throughout the country. Since that time, a group of protesters who call themselves "Occupy Eugene" (OE) have maintained protest sites at various locations throughout Eugene. The members of OE describe themselves as "a group of concerned citizens inspired by Occupy Wall Street." (First Am. Compl. at ¶ 5 [hereinafter FAC].) OE's protest movement focuses on "democracy, economic security, corporate responsibility, . . . financial fairness, and . . . accountability in the United States government." *Id.*

---

[1] In accordance with the standard for a motion for summary judgment, the court reviews the evidence in the light most favorable to the non-moving party.

On May 1, 2012, plaintiffs and approximately ten to twenty-five other members of OE assembled at the plaza of the Eugene Federal Building[2] (Plaza). OE selected the Plaza because it "has always been a lawful place for demonstrat[ors] and picketers to congregate." *Id.* at ¶ 18. Additionally, the Plaza is "located on a highly-visible, busy street corner [and] is adjacent to courthouses, federal, state, and municipal political offices." *Id.*

Shortly after OE arrived at the Plaza, the group set up a tent to be used as a prop that would draw attention to the issue that homeless people did not have a place to legally sleep during the night. Officer Thomas Keedy of the Federal Protective Services (FPS) instructed OE that they could not set up a tent or sleep at the Plaza, but they were welcome to stay as long as they would like. OE complied with Officer Keedy's instructions.

In addition, Officer Keedy asked if a member of OE would be a contact person for the group and sign a GSA permit application. Plaintiff Terrill Purvis agreed to be the point of contact and accepted the permit application. The group, however, was reluctant to apply for a permit because some members of OE knew that the GSA had not previously required protesters to apply for permits. Nevertheless, on May 2, OE submitted a standard sixty-day permit application to Officer Keedy. OE's application requested continuous, non-exclusive use of the Plaza from May 1 through July 1 for up to sixty people for a First Amendment demonstration. After Officer Keedy reviewed the application for potential security impacts, the GSA approved plaintiffs' permit application as requested.

OE used the Plaza without any major incidents[3] and in accordance with the permit guidelines.[4] However, on June 6, when a member of OE contacted Officer Keedy about a sound

---

[2] The Eugene Federal Building is located at 211 East 7th Avenue, Eugene, Oregon.

[3] One man smoked medical marijuana at the Plaza; however, after being informed that he was not permitted to do so while on federal property, he ceased. There was another reported incident involving a young man who vandalized some government property, but he was not affiliated with OE.

3 – OPINION AND ORDER

permit for an upcoming event at the Plaza, Officer Keedy informed the member that she would need to contact the local GSA manager. Officer Keedy said that "the rules for permits had been changed by the GSA due to the fact that the GSA had 'bad' experiences with other Occupy groups in other areas." (FAC ¶ 33.)

Near the end of the initial sixty-day permit period, defendant Wayne Benjamin informed OE that, due to problems with other Occupy groups, the group's renewed permit would only last thirty days and have new restrictions. One of these new restrictions limited OE use of the Plaza from 8 a.m. until 5 p.m., Monday through Friday. AR 25. Specifically, the new permit application contained a "Condition" not included in the original permit application. The new restriction stated "Organized activities authorized under this permit shall be limited to and be held during the public access hours of the property. Current property hours are: Monday – Friday 8:00am to 5:00pm." AR 25.[5]

On June 27, OE filed an application to renew its permit in order to extend their use of the Plaza through July. AR 24. OE requested the same unrestricted terms of the initial permit. After OE expressed its discontent with the 8 a.m. to 5 p.m. restrictions, Benjamin amended the hours of assembly to 7:00 a.m. to 10:00 p.m., seven days a week. AR 16. On June 30, OE informed the GSA that it disagreed with the restrictions and planned to remain at the Plaza without a permit. AR 18.

On July 9, Benjamin denied plaintiffs' application to renew their permit. The GSA indicated that its primary reason for denying the permit was that OE sought "to maintain a presence in the plaza 24 hours a day for a period of 30 days." AR 16-17. The GSA stated that it

---

[4] OE shared the Plaza with several other groups and individuals who were not required to obtain permits.
[5] The original permit application stated, "Organized activities authorized under this permit shall be limited to and be held during the public access hours of the property. (PM to add hours for specific property)." AR 29. GSA signs at the plaza list the hours of operation of the plaza as 6:00 a.m. to 11:00 p.m. AR 414-15.

4 – OPINION AND ORDER

has "an interest in preserving the plaza for use by the general public, maintaining an aesthetically pleasing area and keeping the public safe." *Id.* (stating that 41 C.F.R. § 102-74.500(c) authorizes Federal agencies to disapprove a permit application in certain situations). The denial letter also indicated that plaintiffs could appeal the denial. *Id.* Plaintiffs did appeal but were unsuccessful. Defs.' Ex. 4, 5.

On July 10, Benjamin and another GSA manager went to the Plaza to verbally inform OE that their permit extension had been denied and that the members must vacate the Plaza within twenty-four hours. The managers indicated that if OE did not comply, the GSA would request law enforcement assistance from the FPS. OE responded to the mangers by stating that they believed that they did not need a permit and would continue without a permit.

The following day, as plaintiffs continued their protest, Officer Keedy and FPS Area Commander Michael Foster entered the Plaza at 2:45 p.m. and advised OE and other groups to leave the Plaza or face arrest. AR 9. Subsequently, all of the OE member and members of the public evacuated the Plaza except plaintiff Florence Semple. Semple indicated to Officer Keedy that she believed the eviction was unconstitutional and would only leave upon receipt of a citation or arrest in order to later challenge the eviction. At 7:30 p.m., Semple was arrested for violating 41 C.F.R. § 102-74.385. Semple was handcuffed, transported to processing at the Federal Building, cited, and released. AR 10. The federal government charged Semple but, over Semple's objection, later moved to dismiss the charge.

On December 13, 2012, plaintiffs returned to the Plaza to resume their protest. On December 14, Kimberly Gray delivered a letter to plaintiffs indicating that they had twenty-four hours to leave the Plaza or a complaint and subsequent arrests would occur. Gray's letter did not

5 – OPINION AND ORDER

state any reasons for the ban, indicate the duration of the ban, nor provide any alternative venue for OE's protest. Despite the threat of arrest, plaintiffs continue to protest at the Plaza.

On December 18, 2012, plaintiffs brought two *Bivens* claims alleging that defendants unconstitutionally denied their permit to protest. This court dismissed those claims on December 3, 2013. Plaintiffs' remaining claim for relief is under the APA, Pub. L. No. 79-404, 60 Stat. 237 (1946). Pending are cross motions for summary judgment.

## STANDARD OF REVIEW

The court must grant summary judgment if there is no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999))

## DISCUSSION

Courts may resolve APA challenges via summary judgment. *NW Motorcycle Ass'n v. United States Dep't Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). APA actions are examined under an "arbitrary and capricious" standard; an agency decision is arbitrary and capricious if the agency offers an explanation for its decision that runs counter to the available evidence or is so implausible that it could not arise from a difference in view or be the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*, 463 U.S. 29, 43, (1983). Specifically, the agency must articulate a satisfactory explanation for its action including

6 – OPINION AND ORDER

a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, (1962). Under the APA, a government regulation is sufficiently justified if it is unrelated to the content of speech, it furthers an important or substantial governmental interest, and the restriction on First Amendment freedoms is not greater than necessary to further that interest. *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

At oral argument, OE clarified it is challenging the manner in which GSA is enforcing the regulations behind the permitting scheme. In other words, OE brings an "as applied" challenge to the permitting process. Although OE argues that the permit regulations are unconstitutional because they do not allow for spontaneous protests, there is no evidence plaintiffs ever engaged in any spontaneous protests. OE next argues GSA enacted more stringent regulations based on the content of OE's speech, that GSA exercised overbroad discretion in enforcing the permit regulations, and that the restrictions themselves were not narrowly tailored to any significant government interest. Lastly, OE argues that GSA violated the APA in failing to provide notice and an opportunity to comment on the permitting policy before changing it. *See* 5 U.S.C. § 553(b).

As noted, GSA argues the regulations are constitutional because they are content-neutral and narrowly tailored to advance significant government interests. GSA also argues that the change to the guidance memorandum was interpretative, not substantive, and that as such the GSA was not required to give opportunity for notice and comment under 5 U.S.C. § 533(b)(3).

I.  **The Regulations are Content Neutral**

Whether a regulation is content based or content neutral can generally be determined on the face of the regulation itself. The main inquiry in determining whether the statute regulating speech is content-based is if the government has adopted the regulation because of a

7 – OPINION AND ORDER

disagreement with the message it conveys. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, (1989).

If GSA selectively blocked OE's access to the Plaza because of its intended message, then the GSA regulations are content-based as applied to Occupy. *See Capitol Square Review & Advisory Board v. Pinette*, 515 U.S. 753, 762 (1995). In *Capitol Square*, the plaintiff denied defendant Ku Klux Klan's application to erect a cross as part of a holiday display. *Id.* at 758. The Supreme Court determined that the plaintiff denied the application due to the Klan's message, meaning that the application policy was content-based as applied and violated the defendant's First Amendment rights. *Id.* at 769-70.

Defendants argue that their decision to deny plaintiffs' application was based on 41 C.F.R. § 102-74.500(c), specifically because plaintiffs' "proposed use [interfered] with access to the public area…[and] approved uses of the property by tenants or the public." This regulation clearly makes no reference to speech. However, plaintiffs contend that GSA's decision stemmed out of an internal GSA Guidance Memorandum, which mentions "Occupy Wall Street" by name. AR 33.

GSA argues that the Guidance Memorandum was unrelated to the content of OE's speech, but rather was required due to the unique form of delivery of OE's speech. Occupy is a fairly new movement that holds protests in an atypical style. Specifically, Occupy has been known to set up long, indefinite encampments that pose potential safety hazards and unique considerations for the owner of the property. If the restrictions were based on the form of OE's protest and not the message delivered at said protest, the regulations are content neutral. *See Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 295 (1984).

In *Clark*, the Supreme Court held that a National Park Service regulation prohibiting camping in certain parks did not violate the First Amendment when applied to prohibit demonstrators from sleeping in Lafayette Park and the Mall in Washington, D.C. The regulation challenged by the defendants specifically prohibited camping in non-campground areas if the campers in question were "using the area as a living accommodation regardless of the intent of the participants or the nature of any other activities in which they may also be engaging." *Id.* at 291. The court determined that sleeping was symbolic speech and expressive conduct protected under the First Amendment; however, the fact that the time and place regulations limited this symbolic conduct did not make them any less valid. *Id.* at 294-95. The Court concluded that the Government interest in protecting park property was unrelated to the demonstrators' message about homelessness. *Id.* at 299.

The GSA regulations, like those in *Clark*, did not prohibit any specific message; rather, they were aimed at handling a certain type of protest, regardless of the speech associated with said protest. The memorandum, despite mentioning Occupy by name, makes no reference to the content of Occupy's message; in fact, the regulation refers to Occupy and "similar groups," not just Occupy on its own. AR 33. Because there is no reference to the content of OE's message contained in the Guidance Memorandum, and because the record does not indicate that OE was ever barred from the Plaza due to its message, the regulations are content-neutral. OE seemingly turns a blind eye to the fact that an organization intent on "occupying this space as part of a never-ending protest," AR 24, with tents permanently occupying a public space, could pose unique problems—be it public safety, public access, or public health—to the entity tasked with keeping the space clean and safe for the public and tenants of the adjacent office buildings. Although GSA mentioned Occupy groups by name, there is no evidence GSA considered the

content of OE's speech, or that GSA ever considered anything other than the unique issues presented by a group of permanent "occupiers." Because there is no evidence GSA aimed the regulations at the content of OE's speech, I conclude GSA applied the regulations at issue in a content neutral manner.

## II.   Narrow Tailoring

GSA's argument that the ordinance was narrowly tailored to support legitimate government interests is not supported by the record. Though public safety, aesthetics, and public use are legitimate government interests, the hours regulations listed in OE's second permit application were so tightly restricted that they created an impermissible restriction on OE's First Amendment rights.

The business hours limitation of 8 a.m. to 5 p.m., five days a week on OE's second permit application is much too strict. Though the First Amendment does not guarantee one's right to express one's views at all times and places (*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981)), the government may not act in a manner that has a chilling effect on those wishing to exercise their right to free speech. Though defendants argue that that this restriction is supported by a need to keep the public safe, this restriction on OE's First Amendment freedoms is greater than necessary to further the interest of public safety. Additionally, nothing in this record demonstrates GSA had any concerns due to public safety. GSA has advanced no rational explanation for these business hours limitations.

As noted, the sign posted at the Plaza lists the hours of operation as 6 a.m. to 11 p.m. AR 415-16. Additionally, there is evidence many groups routinely utilize the Plaza for organized events outside of normal business hours, including nearly every weekend.[6] At oral argument, the

---

[6] Although defendants' submissions demonstrate intermittent enforcement of the permitting process, it is clear many organized events throughout the years, even after business hours, did not require permits. This appears to

10 – OPINION AND ORDER

government characterized the 8 a.m. to 5 p.m. restriction as a first attempt at negotiating with plaintiffs. That unreasonable restriction, however, led to an equally unreasonable stance from plaintiffs: a demand for open-ended access to the Plaza 24 hours a day as part of a never ending protest. AR 24. GSA ultimately denied the application based on that unreasonable request. AR 16-17. As noted, written on the denied permit application was a restriction on access to the Plaza from 8 a.m. to 5 p.m. AR 25. I recognize that time place and manner restrictions, even on traditional public fora, need not be the least restrictive alternative available. *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1041 (9th Cir. 2006). That said, First Amendment rights do not vary based on the strength of one's negotiating skills.

Defendants also argue that the business hours limitation was never enforced. I disagree. Plaintiff Semple was arrested upon refusing to leave the Plaza when she was ordered to by FPS officers. AR 7. The FPS officers also ordered the rest of the OE protestors to disperse and began doing so at 3:45 p.m. in the afternoon. AR 9. This shows that not only was the business hours limitation enforced, the enforcement began before 5 p.m., demonstrating an even greater violation of OE's First Amendment rights. Semple's arrest also demonstrates the confusion sown by defendants' application of the permitting process in this instance. Although posted signs state the Plaza is free to all from 6 a.m. until 11 p.m., the permit application states availability is limited from 8 a.m. until 5 p.m. Then, depending on which federal official the applicant speaks to, and depending on the applicant's negotiating acumen, one may be able to extend the available hours to use the Plaza. One wonders how the general public is supposed to differentiate between

---

have resulted not from any bad intentions by federal officials, but instead by the fact that peaceful protests or other events, spontaneous or otherwise, are quite common in downtown Eugene, especially on summer weekends. Combined with the fact that this open Plaza is located right in the heart of Eugene's downtown area, it is no surprise that many individuals and groups simply end up using the Plaza, often outside of normal business hours.

11 – OPINION AND ORDER

when the Plaza is open for free speech purposes, and when one will be arrested simply for standing in the Plaza.

Though defendants argue that the hours limitation they truly endorsed was the 7 a.m. to 10 p.m. limitation, this does not change the fact that OE protestors were ordered to leave during business hours. Though one could make a strong argument that a 7 a.m. to 10 p.m. limitation would be narrowly tailored to support GSA's legitimate interests (*see Clark*, 468 U.S. at 297) the conduct of federal officials on this record, at least initially, points toward a much more limited restriction on access to this traditional public forum.

The Plaza is not a government building or an enclosed space, but rather, as agreed by the parties, a traditional public forum. Traditional public forums are places which "by long tradition or by government fiat have been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Considering the long history of both protests and other gatherings at the federal plaza, as evinced by the record, the Plaza undoubtedly qualifies as this type of forum. The government's right to limit expressive activity in a traditional public forum is strictly limited. *Berger v. City of Seattle*, 569 F.3d 1029, 1036 (9th Cir. 2009) (*en banc*). Therefore, GSA had no right to restrict OE's access to this locale in such a strict manner.

It is important to note this ruling is limited to the facts on this limited record. It is undisputed that GSA informed plaintiffs that they could not utilize the Plaza outside of normal business hours. As noted, Semple was actually cited, arrested, and prosecuted simply for refusing to leave the traditional public forum during the posted open hours. It makes no difference that, with the assistance of several attorneys sympathetic to plaintiffs' cause, GSA ultimately allowed plaintiffs to protest in the Plaza for extended hours. First Amendment rights do not depend on one's knowledge of the scope of such rights, or on one's access to attorneys familiar with

Constitutional guarantees. Additionally, the First Amendment does not go to sleep at 5 p.m. on Friday afternoon and wake up at 8 a.m. on Monday morning. Although GSA may generally use a permitting scheme to oversee access to the Plaza, GSA's permitting process, given the facts present in this action, was not narrowly tailored to serve any significant government interest, and was therefore unconstitutional as applied to plaintiffs.

### III.  Notice and Comment

Plaintiffs claim that GSA was required to provide a period of notice and comment for the guidance memorandum. The necessity of a period of notice and comment hinges on whether or not the change to the memorandum was interpretative or substantive. Only substantive rule changes require a notice and comment period under the APA; interpretative rule changes are exempt from this requirement. 5 U.S.C. § 553(b)(3).

While substantive rules "effect a change in existing law or policy," interpretive rules "merely clarify or explain existing law or regulations." *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983). In *Powderly*, the appellant erroneously received overpayment from the Social Security Administration, who then informed appellant that the payment would have to be returned. *Id.* at 1094. The appellant contended that provisions of the Social Security Claims Manual relating to overpayments represented substantive changes that needed to be published in the federal register. *Id.* at 1097. The Ninth Circuit held that the overpayment provisions did not change any law or policy or remove any existing rights of social security recipients, but rather explained more general terms of the Social Security Act; therefore, the provisions were interpretative and did not require publication in the register or a period of notice and comment. *Id.* at 1098.

13 – OPINION AND ORDER

The Guidance Memorandum "summarizes and reiterates" guidance in reference to the Occupy movement. AR 33. The document does not create new regulations, but rather clarifies regulations already in place. 41 C.F.R. 102-72.460 through 102-74.560 set out the regulations for occasional use of public buildings, including the requirement for a permit application and the limitation on the length of time of a permit. However, the business hours limitation on OE's permit is more problematic because it appears, at first glance, to change existing policy. The court should consider whether the agency action (1) "impose[s] any rights and obligations," or (2) "genuinely leaves the agency and its decisionmakers free to exercise discretion." *CropLife Am. v. E.P.A.*, 329 F.3d 876, 883 (D.C. Cir. 2003) (internal citations omitted).

GSA argues that the business hours limitation on the permit is an exercise of free discretion because GSA officials have consistently waived this limitation. However, that does not change the fact that the limitation remains on the permit form. Allowing protests and activities for only forty-five hours per week imposes significant limitations on anyone who wishes to use the Plaza, not just OE. See e.g. *Aiken v. Obledo*, 442 F. Supp. 628, 649-50 (E.D. Cal. 1977).

In *Aiken*, plaintiffs challenged the unlawful administration of the food stamp program by state and federal officials. *Id.* at 633. The challenged regulation was a collateral contact regulation that was used to verify the accuracy of information provided by food stamp applicants. *Id.* at 634. The District Court found that the collateral contact rule had a significant impact on applicants because it greatly lengthened the certification process for applicants. *Id.* at 653-54. This was a clear departure from previous practice in which certification was granted after one collateral contact was certified. Therefore, the District Court found that these invasive

14 -- OPINION AND ORDER

procedures had a deterrent effect on those wishing to apply for food stamps and invalidated the rule because it was never submitted for notice and comment, a clear violation of the APA. *Id.*

Like in *Aiken*, the business hours limitation on the permit has a similar deterrent effect akin to that of the collateral contact regulation. Though GSA may waive the limitation, said waiver does not ameliorate the chilling effect on one's First Amendment rights upon seeing the limitation on the face of the permit. Because of the impact this business hours limitation has on permit applicants, it is a substantive change, not an interpretative one. Defendants' argument that the rules closing the property after business hours went through notice and comment over 10 years ago is without merit. As noted, the posted signs on the Plaza state that the Plaza is open to the public not during normal business hours, but from 6 a.m. until 11 p.m. AR 415. Then, in response to Occupy groups, defendants attempted to enforce a blanket 8 a.m. to 5 p.m. limitation on use of the Plaza. This was a direct change in agency policy. This policy change is supported by the differences in the two permits filled out by plaintiffs. The first contained no time restriction. The second contained the 8 a.m. to 5 p.m. restriction.

By not submitting the changes for publication in the federal register or making the changes to the permit application available for notice and comment, defendants violated the APA. This conclusion does not limit the discretion afforded public officials under the APA. Applications for permits necessarily encompass a broad range of access for different activities. GSA is entitled to use discretion in enforcing its permitting scheme. But suddenly changing the rules that ordinarily allow access from 6 a.m. until 11 p.m. to a much more restricted 8 a.m. to 5 p.m. goes beyond merely interpreting the existing regulations.

15 – OPINION AND ORDER

## CONCLUSION

The record reveals no nefarious intent on the part of any defendant or federal official. This was a unique situation in which the defendants were forced to deal with new problems presented by plaintiffs' unique form of protest. The situation led defendants to the enforcement of a permitting scheme they had not previously spent much effort enforcing. Ultimately, this led to a chilling of plaintiffs' First Amendment rights. Although GSA has the right to manage its property, those rights sometimes clash with First Amendment rights, especially when, as here, GSA's outdoor property in the middle of downtown Eugene happens to be a traditional public forum. Plaintiff's motion for summary judgment (ECF No. 57) is GRANTED. Defendant's motion for summary judgment (ECF No. 56) is DENIED.

IT IS SO ORDERED.

DATED this __10__ day of September, 2014.

                                        _____
                                        Michael McShane
                                        United States District Judge